**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| LARRY RASNAKE, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:08-CV-134-PRC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| the Social Security Administration, ) | |
| Defendant. ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Larry Rasnake, Sr., on May 15, 2008, and a Plaintiff's Opening Brief [DE 22], filed on October 20, 2008. Plaintiff Rasnake requests that the Court reverse and remand the Administrative Law Judge's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). On January 20, 2009, the Commissioner filed a Reply Brief. For the following reasons, the Court remands this matter for further proceedings consistent with this Opinion and Order.

## PROCEDURAL BACKGROUND

On July 9, 2001, Plaintiff Rasnake filed an application for DIB, alleging a disability onset date of June 14, 1998. Plaintiff's application was denied, and no subsequent appeal was filed. Plaintiff later filed a second application for DIB, alleging the same disability onset date as the first application. The Agency denied the application upon initial consideration and reconsideration. In response, Plaintiff filed a timely request for an administrative hearing.

Administrative Law Judge ("ALJ") Frederick McGrath held a hearing on September 20, 2004, at which Plaintiff, his attorney Joseph W. Shull, his wife Deborah Rasnake, and Vocational

Expert Dr. Leonard Fisher appeared, in person, in Fort Wayne, Indiana. In a decision dated March 30, 2005, the ALJ found that the Plaintiff was not disabled, and denied his application for DIB. Plaintiff Rasnake timely filed a Request for Review of Hearing Decision, which was denied by the Appeals Council. Plaintiff filed a subsequent claim for Supplemental Security Income ("SSI") on June 27, 2005, which was consolidated with his DIB claim.

Plaintiff filed for judicial review of the Agency's decision in the Northern District of Indiana, and on January 17, 2007, the Court reversed the decision of the Commissioner and remanded the matter for further administrative proceedings. *Rasnake v. Barnhart*, 1:05-CV-236 (N.D. Ind. January 17, 2007).

On remand, a new hearing was conducted before the same ALJ. On July 13, 2007, the ALJ held a hearing, at which Plaintiff, his wife Deborah Rasnake, his attorney Joseph W. Shull, and Vocational Expert Robert Bond appeared, in person, in Fort Wayne, Indiana. In a partially favorable decision dated October 19, 2007, the ALJ found the Plaintiff disabled as of June 15, 2006, which made him eligible for SSI, but not for DIB, because the Plaintiff had not been found disabled before his December 31, 2003 date of last insured ("DLI"). Plaintiff filed Exceptions to the ALJ's decision, but the Appeals Council denied it and declined to assume jurisdiction, leaving the ALJ's decision as the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Rasnake's Background

Plaintiff was fifty two years old at the time of his DLI and forty seven years old at the time of his alleged onset date. Plaintiff has a general educational development certificate ("GED") and previously worked as a trackman, track machine operator, trimmer, and machine operator.

### B. Summary of the September 20, 2004 Hearing

On September 20, 2004, the ALJ held a hearing, at which Plaintiff, his attorney Joseph W. Shull, his wife Deborah Rasnake, and Vocational Expert Dr. Leonard Fisher appeared, in person, in Fort Wayne, Indiana.

*1. Plaintiff's Testimony*

At the September 20, 2004 hearing, Plaintiff testified that he was right-handed and could only lift a couple of pounds with his right arm. Plaintiff testified that he had problems reaching with his right arm, and could only use it to reach, handle objects, or manipulate items occasionally. Plaintiff testified that he had numbness and no strength in his right hand, which caused him to drop things. He could write with his right hand, but it would take longer than normal. He had problems using buttons, picking up coins from a table, and keyboarding. Plaintiff thought his left arm was weak too, but better than the right, as he could carry two gallons of milk and reach constantly with his left hand.

Plaintiff estimated that he could stand an hour at a time, walk two to three blocks, and sit 45 to 60 minutes at a time. Plaintiff claimed that he had to lie down to stop his extreme neck, right arm, and low back pain, and that he got up from his bed only four hours a day. Plaintiff alleged that all activities aggravated his upper body pain, and bending aggravated his low back pain. He did no

household chores, but read magazines and visited with friends. Plaintiff testified that he took hydrocodone and ibuprofen, which helped, but did not stop the pain. Plaintiff rejected surgery because he was afraid it would not work and might leave him paralyzed.

Plaintiff testified that he was fired due to absenteeism, but he did not think it had anything to do with drugs or alcohol. He had a significant history of drug and alcohol use, with multiple DUI arrests. Plaintiff testified that he last used marijuana a month before the hearing, and, at the time of the hearing, drank a beer every six months. He had severe depression and was taking Lexapro, with very little result.

Plaintiff's wife, Debra Rasnake, testified that she had observed her husband have difficulty using his right hand and arm. She testified that when Plaintiff got "real depressed" he stayed in his room. She was not sure if he was depressed or in pain, but he was no longer able to engage in the activities he performed before the October 5, 2000 automobile accident.

*2. Medical Evidence*

On October 5, 2000, Plaintiff was involved in a single-vehicle rollover accident and was hospitalized. Plaintiff's chief complaint upon arrival at the hospital was right shoulder pain. The discharge diagnoses include probable right shoulder dislocation (self-reduced), cervical strain, and thoracic contusion.

On September 14, 2001, Dr. Venkata Kancherla performed a consultative physical examination. Plaintiff told the doctor that he had quit his last job due to a six-year history of neck, back, and shoulder pains. On examination, Dr. Kancherla found that lumbar range of motion was restricted and cervical range of motion was restricted due to pain. On system review, Plaintiff reported that he had back pain all of the time, which was non-radiating in nature, and that he had

neck and shoulder pain along with tingling and numbness in his right hand. Reflexes, sensation, muscle strength, station, and dexterity were all normal. Plaintiff's other joints were grossly normal and his sensory and vibration sensations were normal. Hand grip was essentially equal bilaterally with muscle strength in all four extremities at a 5/5 with normal tone, and there was no wasting, atrophy, or fasiculations. Dr. Kancherla's impression was cervical spine mobility restricted secondary to pain with an otherwise normal physical examination.

According to Dr. Robert C. Stone's records, he gave Plaintiff a prescription for Vicodin the day after his auto accident, and did not see him again until April 6, 2002, when Plaintiff complained of marked weakness in his right hand. Dr. Stone referred Plaintiff to Dr. Madhav Bhat.

Plaintiff saw Dr. Bhat, a neurologist, on May 16, 2002. Plaintiff complained of neck and right shoulder pain since October 2000. A neurological examination showed Plaintiff to have normal strength in the left arm and both legs, and "questionable" giveaway weakness in the right deltoid. Strength and sensation were normal and right shoulder movements were unremarkable. Biceps and brachial radialis reflexes were absent on the right. Plaintiff reported recurrent left hand paresthesias[1] and intermittent left hand paresthesias. Plaintiff ambulated well. Dr. Bhat's diagnosis was clinical symptoms secondary to upper cervical radiculopathy, and he arranged for a magnetic resonance imaging ("MRI") of the cervical spine.

A June 29, 2002, MRI revealed findings highly suggestive of a right-sided unilateral facet lock at the C6-7 level, as well as multilevel cervical spondylosis accentuated by congenitally narrowed AP dimension of the spinal canal.

Dr. William Young, a neurosurgeon, examined Plaintiff on July 15, 2002. Plaintiff had

---

[1] Paresthesia is an abnormal sensation of tingling, burning, crawling, or tickling. It occurs in some forms of neuritis, and certain abnormal conditions of the spinal cord, etc. Schmidt's Volume 3 at P-57.

reduced motor strength in his right arm, as well as absent reflexes and evidence of atrophy. His motor strength was 3/5 in the right deltoid, 4/5 in the biceps and triceps, and right hand intrinsics. He experienced pain on flexion-extension of his cervical spine. Dr. Young reviewed the MRI and observed evidence of a facet jump on the right at C6-7, which he thought might be related to Plaintiff's symptoms but did not necessarily explain all of his complaints. Dr. Young recommended plain x-rays of flexion-extension views of the cervical spine, a computed tomography ("CT") scan of the cervical spine, and an electromyogram ("EMG") of the right lower extremity.

A July 30, 2002 EMG produced findings consistent with a subacute radiculopathy on the right affecting mostly C5-6 and C6-7. An August 13, 2002 CT scan of Plaintiff's cervical spine revealed extensive degenerative changes of the cervical spine, and findings consistent with a locked facet on the right at C6-7 with anterior displacement of C6 on C7, as well as an anterior rotary subluxation of the right lateral mass of C2 in relation to the facet with C1. Plain x-rays of the cervical spine demonstrated a perch facet with associated anterior displacement of the C6 and C7.

Dr. Young saw Plaintiff again on September 9, 2002, and noted the results of the EMG, CT scan, and plain x-rays. He thought that Plaintiff's symptoms were related to a facet dislocation which had auto-fused, and that Plaintiff's chronic pain and arm weakness was caused by instability and neural foraminal narrowing. Dr. Young recommended a foraminotomy and cervical fusion, which would provide more room for the nerve roots but was not likely to completely correct Plaintiff's spinal alignment. Plaintiff told Dr. Young that he was interested in proceeding with surgery, but he had to sort out some medical insurance issues.

Dr. Digal Katarki performed a consultative physical examination of Plaintiff on October 5, 2002, at the request of the Social Security Administration. Plaintiff told Dr. Katarki that his neck,

shoulder, and back problems began after the auto accident and his back pain was brought on by long standing or walking. On examination, Plaintiff had a normal gait and station, and had no problem walking on heels and toes, tandem walking, or hopping. He had problems squatting and rising from a squat due to pain in the lower back, and range of motion was limited in the cervical and dorsolumbar spines and upper extremities. Straight leg raising was positive at 35 degrees. Dr. Katarki noted that the Plaintiff sat with his right arm closer to his body than his left arm with the right arm lying limp next to his side. Muscle strength and hand grip were reduced on the right, and fine finger manipulation was abnormal. Dr. Katarki concluded that Plaintiff had shoulder and neck pain status post a motor vehicle accident. He concluded that Plaintiff could lift and carry no more than one to two pounds with his right hand, and could not pick up coins, button his shirt, or open a doorknob with his right hand. He would also have problems pushing or pulling. Plaintiff also had trouble sitting more than 20-25 minutes at a time due to back pain, but no trouble standing or walking.

Plaintiff saw Dr. Donald Stallman on July 10, 2003, seeking pain medication. Plaintiff reported refusing surgery and not taking medication. Dr. Stallman prescribed Celebrex.

Plaintiff saw a social worker, Gilberto Perez, on July 22, 2003, complaining that he felt sad, withdrew from others, and had suicidal thoughts on a weekly basis. He admitted to weekly marijuana use. He had five or six DUI arrests before his accident, but had not consumed alcohol heavily since the accident. He claimed that he had put a gun to his head two years earlier. The therapist offered a diagnosis of major depression and cannabis abuse and assigned Plaintiff a Global

Assessment of Functioning ("GAF") score of 50.[2]  Plaintiff was prescribed Lexapro, but he failed to appear for follow-up visits and was discharged for lack of follow through on treatment recommendations.

On May 12, 2004, Plaintiff saw family physician Dr. Benito Perez, Jr., with complaints of neck pain aggravated by movement and relieved by lying supine.  He also experienced numbness in his right hand.  On examination, Dr. Perez observed poor muscle tone in the cervical spine, severely reduced range of motion, and right neck spasms.  Dr. Perez also noted chronic depression for which Plaintiff was reportedly taking medications regularly.  However, Dr. Perez observed no unusual anxiety or appearance of depression.

Plaintiff saw Dr. Perez again on July 14, 2004, noting that 90 percent of his pain subsides when he lies down.  Plaintiff was not anxious, fearful, or euphoric.  The examination was negative for paranoia, depressed mood, irritability, or obsessive-compulsive behaviors.  Plaintiff denied hopelessness, mood swings, suicidal thoughts or hallucinations, and was in no apparent distress. Plaintiff had right shoulder and elbow tenderness, atrophy, and severe pain with motion.  He was taking Motrin, Flexeril, Vicodin, and Lexapro.

Plaintiff saw Dr. Perez again on September 9, 2004.  By that time, Plaintiff had stopped taking Lexapro, though he noted that it had helped initially.  Plaintiff was anxious and fearful, but without euphoria, paranoia, depressed mood, irritability, obsessive-compulsive behaviors, suicidal thoughts, or hallucinations.  He had right shoulder pain of moderate severity with weakness, improved by nonsteroidal anti-inflammatory medications. Plaintiff was in no apparent distress.  The

---

[2] A GAF of 41 to 50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR)* 34 (2000).

right shoulder continued to exhibit tenderness, reduced motion, muscle atrophy, and reflex loss. Plaintiff had normal insight but poor judgment. Medications were Motrin, Lexapro, and Vicodin. Dr. Perez diagnosed chronic depression and cervical radiculitis.

*3. VE's Testimony*

Dr. Leonard Fisher testified as VE at the September 20, 2004 administrative hearing. The ALJ posed a hypothetical question to the VE, directing him to assume an individual with Plaintiff's vocational characteristics who:

> would be limited to light work with a sit/stand option, limited use of his right hand and arm. No fine manipulation with the right hand. No overhead work with the right hand. No lifting and carrying objects weighing over two pounds of weight and with the sit/stand option.

R. at 192.

The VE testified that the hypothetical individual could perform jobs such as a parking lot attendant (about 125-300 jobs in northeast Indiana), information clerk (125-200 jobs), school bus monitor (about 150 jobs), and usher (125 jobs). The VE testified that he would not generalize too much further than the jobs he had identified because of the significant limitations set forth in the ALJ's hypothetical question. The surveillance systems security monitor position would be a sedentary job consistent with the hypothetical. The VE testified that missing more than one day of work a month would jeopardize employment.

On cross-examination by Plaintiff's attorney, the VE confirmed that the hypothetical individual could perform the identified jobs if he also was limited to occasional handling and reaching with the right dominant hand and arm, with the left arm and hand able to perform essentially normal. To the extent the VE's testimony was inconsistent with the *Dictionary of Occupational Titles* (DOT), he based his opinion on his personal observations and interactions with

people in such jobs, as well as consultations with other vocational experts, vocational surveys, and labor specialists at the employment office.

## C. Summary of the July 13, 2007 Hearing

On July 13, 2007, Administrative Law Judge Frederick McGrath held a hearing, at which Plaintiff, his wife Deborah Rasnake, his attorney Joseph W. Shull, and Vocational Expert Robert Bond appeared, in person, in Fort Wayne, Indiana.

### 1. Plaintiff's Testimony

At the July 13, 2007 hearing, Plaintiff testified that he did not go ahead with surgery because he was not sure it would make everything better and he had a longstanding fear of doctors. Plaintiff testified that since the first hearing his arm had become more sore and numb and functioning was "[i]f anything, . . . worse." R. at 413. Plaintiff testified that he had no feeling in his right hand and he did not experience neck pain when lying down on a bed propped up on pillows with his feet up. Plaintiff further testified that he could hold a cup and possibly a pitcher of water in his right hand, he could use his right hand to assist his left hand, but he could not open lids or button clothes with his right hand. Plaintiff reported "almost life-long" problems with depression which had worsened due to stress. R. at 415. Plaintiff alleged that his bouts of depression lasted seven to ten days and occurred once or twice a month. During bouts of depression he did not function and stayed in his room. Debra Rasnake testified that her husband became depressed "a lot" and stayed in his room and moaned. R. at 418. She reported that Plaintiff had problems with sleep, and needed assistance tying his shoes and washing his back.

### 2. Medical Evidence

Dr. Farbat Usman performed a consultative examination of Plaintiff on September 10, 2005. Plaintiff complained of arthritis and neck pain. Plaintiff walked without a limp or assistive device and he could walk on toes but not heels. Straight leg raising was negative. Active range of motion was significantly reduced in Plaintiff's right shoulder. Dr. Usman wrote: "[i]t seems like the patient has difficulty in standing and walking for two hours in an eight-hour day." R. at 339. Muscle strength was generally full and symmetrical, but Plaintiff's grip strength was reduced in his right hand. Deep tendon reflexes were normal. Plaintiff had difficulty, but was able to: pick up coins from a table; rotate a doorknob with both hands; and, button, unbutton, zip, and unzip clothing using both hands. Plaintiff rated his arthritis pain as 5/10 in severity. He reported morning stiffness and neck pain radiating into his right shoulder and arm with numbness when he tried to lift anything. Plaintiff was unable to specify a time frame for sitting but said his right arm worsened if he sat for a long time. He could stand for half an hour and walk for half an hour at a time. Plaintiff reported that he had difficulty in carrying and handling objects because of his shoulder pain. Plaintiff reportedly had no mental impairment.

Drs. Antoinette Dobson and William Bastnagel reviewed Plaintiff's records for the Agency on October 5, 2005, and January 5, 2006, respectively, and concluded that he could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; had a limited ability to push and/or pull in the upper extremities; could never climb ladders, ropes, or scaffolds; could not balance; could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; could occasionally reach overhead on the left, never on the right; could constantly handle on the left, frequently on the right; could engage in occasional fine fingering with both hands; had no limits on feeling; and,

should avoid concentrated exposure to workplace hazards.

Dr. Joelle Larson reviewed Plaintiff's records for the Agency on October 21, 2005, and opined that he did not have a severe mental impairment.

Dr. Ralph Inabnit performed a consultative examination of Plaintiff on May 29, 2007 at the Agency's request. Plaintiff reported that he could drive a car, pick up a coin, write a letter, open a jar, tie his shoes, and dress and feed himself, but he did no housework, laundry, or shopping. He was taking Vicodin. Range of motion of Plaintiff's cervical spine was somewhat reduced, and right shoulder range of motion was limited to 100 degrees abduction (full = 150 degrees), 70 degrees external rotation (full = 90 degrees), and 20 degrees internal rotation (full = 40 degrees). Grip strength was 4/5 bilaterally, which Dr. Inabnit described as normal. Grip strength was normal bilaterally. No mental abnormality was noted. There was no tenderness over Plaintiff's cervical spine. Motor was 4/5 in the upper and lower extremities. There was no drift to the outstretched arms. Direct strength testing revealed no extremity weakness. Muscle tone was normal. Sensation was intact throughout. Gait was normal. Reflexes were symmetrical and normal bilaterally. Dr. Inabnit noted that a prior EMG showed a subacute radiculopathy in the right arm/shoulder. Plaintiff was last evaluated three and a half years earlier and was not seeking treatment at that time. He denied physical therapy or visiting a pain clinic for a facet block. Plaintiff complained of motor weakness with intermittent paresthesias and numbness in his hands. However, gross and fine motor skills remained intact. Dr. Inabnit recommended x-rays of the cervical spine and EMG of the right upper extremity, and stated that if Plaintiff truly had a radiculopathy, he might be a candidate for decompression and release on that side. Dr. Inabnit also recommended a trial of physical therapy and traction.

In a Medical Source Statement of Ability to Do Work-Related Activities (Physical) dated June 6, 2007, Dr. Inabnit opined that Plaintiff could: lift up to 50 pounds occasionally and carry up to 20 pounds occasionally; sit, stand, or walk up to four hours at a time without interruption; could reach, handle, finger, and push/pull occasionally and feel frequently with his right hand; could frequently operate foot controls bilaterally; could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; could occasionally climb ladders or scaffolds; could occasionally work around environmental hazards or extremes; and, could engage in activities such as shopping, traveling without assistance, using public transportation, preparing simple meals, caring for personal hygiene, and sorting, handling, and using paper/files.

Dr. Robert Walsh performed a consultative psychological examination of Plaintiff on May 24, 2007, at the Agency's request. Plaintiff reported extreme sadness every week to ten days and that the sadness lasted for about a week. He claimed that he had held a gun to his head on two occasions but could not go through with it, having last done so seven or eight years before the examination. Plaintiff denied any current suicidal or homicidal ideation. Plaintiff reported sleep difficulty, fatigue, and poor concentration, among other problems. He last worked in a machine shop eight or nine years before the examination but quit because he could not keep up with the required piece rate. On examination, Plaintiff's affect was animated and he was in an anxious mood. He displayed no cognitive deficits and he was on task with fair attention and concentration. No memory problem was apparent. Dr. Walsh administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test, but the profile produced by Plaintiff's responses was reported invalid. Plaintiff "responded in an extremely exaggerated fashion and endorsed a wide variety of rare symptoms and attitudes." R. at 398. Dr. Walsh opined that Plaintiff's response style may be a result

of excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help, or a confused state.

Dr. Walsh diagnosed Plaintiff with Major Depressive Disorder, recurrent, moderate, and Generalized Anxiety Disorder, and assigned Plaintiff a GAF score of 55.[3] He opined that Plaintiff should benefit from medication management and outpatient therapy. Dr. Walsh completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on May 17, 2007, and opined that Plaintiff: was mildly limited with regard to simple instructions, judgments, and decisions; was moderately limited with regard to more complex instructions, judgments, or decisions; was mildly limited in interacting with the public, supervisors, co-workers, and changes in work situations and routine work settings.

Dr. Walsh completed another Medical Source Statement of Ability to Do Work-Related Activities (Mental) on October 3, 2007, and opined that Plaintiff was moderately limited in: maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining an ordinary routine without special supervision; completing a normal workday or workweek; and, performing at a consistent pace.

*3. VE's Testimony*

Robert Bond testified as VE at the July 13, 2007 administrative hearing. The ALJ posed a hypothetical question to the VE, directing him to assume an individual with Plaintiff's vocational

---

[3] A GAF of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

characteristics who: could perform medium[4] skilled work with a sit/stand option; had the ability to stand, sit, and walk for at least three hours at a time; could perform occasional reaching overhead, handling, fingering, and pushing/pulling with the dominant right hand; could occasionally climb ladders and scaffolds; and, could work around other employees throughout the workday but was limited to brief (15 minutes at a time) conversations and interpersonal interaction with them. The VE testified that there would be no medium jobs the individual could perform, but there would be light[5] jobs the individual could perform. The VE indicated that representative jobs would include: router (DOT 222.587-038) (about 250 jobs in the regional economy); inserting machine operator (DOT 208.685-018) (about 75 jobs in the region); and classifier (DOT 361.687-014) (about 125 jobs in the region). The VE testified that an individual described in the ALJ's hypothetical question could perform the cited jobs as they were described in the DOT and the accompanying *Selected Characteristics of Occupations* ("SCO"). The VE estimated that the hypothetical limitations eroded the light, unskilled occupational base by approximately eighty percent of jobs.

Plaintiff's attorney asked the VE whether the individual could perform the inserting machine, router, and classifier jobs he had identified in light of the SCO's description of the jobs as requiring frequent reaching and handling and occasional fingering. The VE testified that the individual could perform the jobs because the hypothetical's restrictions on these activities was with regard to the right hand only and the individual could still perform those functions with the left hand. The VE confirmed that he had actually seen the jobs performed.

---

[4]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

[5]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b).

Plaintiff's attorney asked the VE how he determined the number of jobs that he identified. The VE stated:

> I utilize a number of sources to look at how the jobs are in numbers as they exist in the regional economy. You can get, there's information from the County Business Patterns, also from the census reports. There is the Occupational Employment Statistics from the Bureau of Labor Statistics. There's information from the Indiana Department of Workforce Development and we look at the DOT and the SCO and then also the [U.S. Department of Labor Bureau of Labor Statistics] *Occupational Outlook Handbook*.

R. at 436. The VE indicated that no single source provided a specific number of jobs for a given DOT number. The VE testified that he synthesized the information provided in the various sources, along with his own personal observations, to arrive at the number of jobs to which he testified given the restrictions set forth in the ALJ's hypothetical question. He was not relying on any specific surveys. The VE confirmed that there was no book or computer program that someone could simply use to find those numbers. The VE noted that the varying classifications of the various jobs made the process more complicated.

Plaintiff's attorney objected to the VE's testimony, arguing that the numbers of jobs to which the VE testified were not based on a "reliable, reproducible method that somebody else can check." R. at 439.

### D. ALJ's Decision

In a written decision issued on October 19, 2007, the ALJ determined that Plaintiff was not disabled under the Social Security Act prior to June 15, 2006, but was disabled thereafter. The ALJ decided in Plaintiff's favor on Steps One and Two, finding that Plaintiff's arthritis, carpal tunnel syndrome, depression, and cervical disc disease were severe. Although the Plaintiff's impairments were "severe" within the meaning of the Regulations, the ALJ did not find that the impairments,

even in combination, met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1., and also found that Plaintiff did not meet a listing in Step Three.

The ALJ concluded that Plaintiff had the following RFC to:

> lift 20 pounds occasionally and 10 pounds frequently, he needs an option to alternate sitting and standing, and can sit, stand, and walk for at least 3 hours at a time, is limited to occasional (up to 1/3 of the work day) reaching overhead, handling, fingering, and pushing/pulling with his right dominant hand, he can occasionally climb ladders and scaffolds. He is limited to unskilled work around other employees throughout the work day but with only occasional (up to 1/3 of the work day) conversations and interpersonal interaction of a brief nature (up to 15 minutes at a time).

R. at 232.

Based on the ALJ's evaluation of the entire record, he concluded that Plaintiff was not under a disability at any time prior to June 15, 2006, and that there existed a significant number of jobs in the national economy that Plaintiff could have performed. However, upon reaching the age of 55 on June 15, 2006, the ALJ concluded that a significant number of jobs did not exist in the national economy that Plaintiff could perform, and, therefore, Plaintiff has been under a disability since June 15, 2006.

The ALJ considered Plaintiff's subjective allegations of mental impairment, but based on the clinical signs and findings, found Plaintiff's asserted functional limitations not wholly credible. The ALJ noted that Plaintiff's lack of follow up treatment, invalid MMPI-2 results, and reports that Plaintiff interacted normally with his family and friends suggested that Plaintiff's subjective symptoms were not as severe as he testified. However, the ALJ noted that notwithstanding Plaintiff's subjective symptoms, the objective medical evidence suggested that Plaintiff was suffering from a severe depression causing moderate difficulty with maintaining social interaction and concentration, which is why the ALJ's RFC limited Plaintiff to unskilled work and a minimal

amount of social interaction and contact with coworkers.

The ALJ concluded at Step Four that Plaintiff could not perform any of his past relevant work, which included work as a trackman, track machine operator, machine operator, and trimmer. The ALJ found at Step Five that Plaintiff was not disabled prior to June 15, 2006, because he remained capable of performing a significant number of jobs in the economy. Accordingly, the ALJ denied Plaintiff's application for DIB, but found that he became disabled after he turned fifty-five years old on June 15, 2006.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial

review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) . The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).

To be found disabled, the claimant's impairment must not only prevent him from doing his previous

work, but considering his age, education, and work experience, it must also prevent him from

engaging in any other type of substantial gainful activity that exists in significant numbers in the

economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry

to evaluate whether the claimant is entitled to benefits.  20 C.F.R. § 404.1520(a)(4).  The steps are:

(1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled,

and the claim is denied; if no, the inquiry proceeds to Step 2.

(2) Does the claimant have an impairment or combination of impairments that are severe?

If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3.


(3) Does the impairment(s) meet or equal a listed impairment in the appendix to the

regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry

proceeds to Step 4.

(4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not

disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5.

(5) Can the claimant perform other work given the claimant's residual functional capacity,

age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if

no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(iv); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir.

2004). At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the ALJ committed reversible error by: (1) failing to properly evaluate the medical opinion of Dr. Farbat Usman; (2) failing to evaluate the medical opinion of Dr. Digal Katarki; (3) failing to include in his RFC limitations that reflected Plaintiff's deficiencies in concentration, persistence, or pace; (4) improperly evaluating the credibility of Plaintiff's symptom testimony regarding his mental impairments; (5) failing to explain how he resolved the conflict between the VE's testimony and the DOT; and (6) that the ALJ's finding at Step Five was not supported by substantial evidence. The Defendant argues that the ALJ's findings are supported by substantial evidence and that the ALJ complied with the relevant legal requirements.

### A. Medical Opinion of Dr. Usman and Dr. Katarki

Plaintiff first argues that the ALJ improperly discredited the testimony of Dr. Farbat Usman, a consulting physician,[6] regarding Plaintiff's ability to stand or walk. Defendant contends that Dr. Usman's medical opinion was not based on objective medical evidence, but rather that Dr. Usman

---

[6] There is no dispute as to whether Dr. Farbat Usman was a treating source or non-treating source. *See* Pl.'s Opening Br. 11 (stating that Dr. Usman performed a "consultative physical exam" of the Plaintiff); Def's Resp. Br. 9 (stating that "Dr. Usman performed a consultative examination of Plaintiff").

simply adopted the subjective complaints made by the Plaintiff in coming to his medical opinion.

The ALJ is required to review and evaluate "every medical opinion." *See* 20 C.F.R. § 404.1527(d). Dr. Usman performed a consultative examination of Plaintiff on September 10, 2005. During the examination, Dr. Usman noted that Plaintiff was able to ambulate well and without assistance. Dr. Usman also observed that Plaintiff was unable to walk on his heels, but was able to walk on his toes. Further, Dr. Usman stated that "[i]t seems like the patient has difficulty in standing and walking for two hours in an eight-hour day." R. at 339. Dr. Usman concluded that Plaintiff could stand for "half an hour and walk for half an hour at a time." R. at 340.

Approximately twenty months later, on May 26, 2007, Dr. Inabnit performed a consultative examination of Plaintiff. Dr. Inabnit reported that Plaintiff ambulated without assistance. Further, Dr. Inabnit determined that Plaintiff could sit, stand, or walk for three hours in an eight-hour day and four hours without interruption. Notably, Dr. Inabnit's limitations formed the basis of the ALJ's RFC determination, which limits Plaintiff to sitting, standing, and walking for at least 3 hours at a time.

Both, Dr. Usman and Dr. Inabnit, are consultative examiners and non-treating sources.[7] Unlike a treating source,[8] the ALJ is not required to give controlling weight to a non-treating

---

[7] "A non-treating source is a physician[,] psychologist or other acceptable medical source who has examined an individual 'but does not have, or did not have, an ongoing relationship' with an individual." *Bradley v. Commissioner of Social Security*, 3:07-CV 599 CAN, 2008 WL 5069124, at *4 (N.D. Ind. Nov. 25, 2008) (quoting 20 C.F.R. § 416.902).

[8] "A treating source is an individual's own physician, psychologist or other acceptable medical source that has provided that individual 'with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship' with that individual." *Bradley*, 2008 WL 5069124, at *4 (quoting 20 C.F.R. § 416.902).

source,[9] and may give one physician's opinion more weight than another physician's opinion. *Haynes v. Barnhart*, 416 F.3d 621, 631 (7th Cir. 2005). While the ALJ addressed Dr. Usman's September 10, 2005[10] opinion, the ALJ instead relied on the most recent evidence, taken from Dr. Inabnit's May 26, 2007 examination (almost two years after Dr. Usman's examination), in finding that the Plaintiff is able to sit, stand, or walk for 3 hours at a time. While Dr. Usman indicated that "[i]t seems like" Plaintiff had difficulty standing and walking for two hours in an eight hour day, the ALJ noted that the physical examination indicated that Plaintiff walked normally, as it provided that Plaintiff could walk without a limp and without assistance. R. at 339. Later, the ALJ evaluated Dr. Usman's opinion, but noted that he mostly repeated Plaintiff's allegations regarding his limitations. Accordingly, the ALJ chose to rely on the most recent evidence found in Dr. Inabnit's consultative examination when determining the Plaintiff's RFC limitation.

Therefore, the record indicates that the ALJ evaluated Dr. Usman's opinion and substantial evidence supports the ALJ's assessed RFC limitations based on Dr. Inabnit's opinion.

Next, Plaintiff argues that the ALJ failed to review and evaluate the medical opinion of Dr. Katarki which limited the Plaintiff to carrying no more than one to two pounds with his right hand and found that Plaintiff would have trouble for sitting more than 20-25 minutes at a time due to his neck pain. The Defendant responds that the ALJ was not obligated to evaluate the medical opinion of Dr. Katarki because the opinion was based entirely on Plaintiff's subjective complaints which

---

[9] An ALJ is supposed to give controlling weight to a treating physician's opinion under the "treating physician rule" codified in 20 C.F.R. § 404.1527(d)(2) if the medical opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008)(quoting *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).

[10] The ALJ mistakenly noted that the consultative physical examination took place on "September 10,*2003*." R. at 234 (emphasis added).

does not contain the objective medical evidence necessary to constitute a medical opinion.

An ALJ is not required to provide an in-depth analysis of every piece of evidence that the claimant provides. *Zurawski*, 245 F.3d at 888; *Diaz*, 55 F.3d at 307. All that is required of the ALJ is to provide a logical bridge between the evidence and his conclusion. *Young*, 362 F.3d at 1002; *Hudson*, 2008 WL 474207, at *3. Here, the ALJ reviewed and evaluated the medical opinions of Dr. Usman and Dr. Inabnit in arriving at the Plaintiff's RFC. While the Plaintiff is correct that the ALJ did not mention Dr. Katarki specifically by name in his report, the ALJ does reference Dr. Katarki's report in a parenthetical citation in his discussion of Dr. Inabnit's medical conclusions about the Plaintiff's ability to lift and carry weight with his right arm.[11] Although the ALJ's evaluation of Dr. Katarki's medical report was cursory, the ALJ is only required to "minimally articulate his reasoning," which the ALJ did here. *See Zblewski v. Astrue,* 302 F. App'x. 488, 493 (7th Cir. 2008). The ALJ created a logical bridge between the evidence and his conclusions by relying on the considerably more recent medical opinion of Dr. Inabnit in arriving at the Plaintiff's RFC. Accordingly, the ALJ did not commit reversible error.

### B. Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ's unskilled work limitation fails to reflect the Plaintiff's deficiencies in concentration, persistence, or pace. Conversely, the Defendant argues that the unskilled work limitation is sufficient to account for the Plaintiff's foregoing deficiencies because

---

[11] Even if the ALJ failed to review and evaluate the medical report of Dr. Katarki, this Court finds that such an error would have been harmless. Remand based on this inconsistency would not alter the outcome as there is no basis for finding that Plaintiff could not lift 20 pounds occasionally and 10 pounds frequently. *See Reider v. Astrue*, No. 07 C 7271, 2008 WL 2745958, at *14 (N.D. Ill. July 11, 2008) (holding that error was harmless where there was no basis for the court to find that plaintiff could not perform the other positions identified by the ALJ). Harmless errors in administrative proceedings do not require remand upon judicial review. *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003).

the limitation also restricts the amount of social interaction the Plaintiff may engage in.

In arriving at the Plaintiff's mental RFC, the ALJ must assess the Plaintiff's degree of functional limitation in four functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(C)(3); *see also Steininger v. Astrue*, No. 1:07-CV-00278, 2008 WL 4539001, at *5-7 (N.D. Ind. Oct. 7, 2008). If limitations are found in one of the four functional areas, the ALJ must "incorporate" these limitations in the hypothetical posed to the VE. *Kasarky v. Barnhart,* 335 F.3d 539, 543-44 (7th Cir. 2003) (stating that "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers").

At Step 3, using the special technique, the ALJ found that Plaintiff had a "mild restriction secondary to his depression" in his activities of daily living, "moderate difficulties" in his social functioning, "moderate difficulties" in concentration, persistence or pace, and "no episodes of decompensation." R. at 230-31. Plaintiff concedes that the ALJ accounted for Plaintiff's deficiency in social functioning by incorporating interpersonal interaction limitations in his mental RFC. However, Plaintiff argues that the ALJ's mental RFC did not incorporate Plaintiff's moderate limitation in concentration, persistence, or pace, instead limiting Plaintiff to unskilled work.

An ALJ is "free to formulate his mental [RFC] assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *O'Connor-Spinner v. Astrue*, No. 4:06-CV-0171-DFH-WGH, 2007 WL 4556741, at *7 (S.D. Ind. Dec. 20, 2007). Furthermore, an ALJ is allowed to reasonably rely on the opinion of a medical source who translates his findings into a RFC assessment when the ALJ formulates a hypothetical. *Steininger v. Astrue*, No. 1:07-CV-00278, 2008 WL 4539001, at *5 (N.D. Ind. Oct. 7, 2008).

This, however, is not the case where the ALJ based his mental RFC, or hypothetical, upon a medical expert's translation of Plaintiff's deficiencies in concentration, persistence, or pace, to a specific RFC finding. As the ALJ noted, Dr. Walsh assessed that Plaintiff had moderate limitations with concentration, persistence, or pace, however, he did not translate these limitations into an RFC limiting Plaintiff to unskilled work. Here, in making his RFC determination, the ALJ provided that the objective mental health records indicated that Plaintiff's depression is severe and caused moderate difficulty with maintaining social functioning and concentration, but concluded that the social interaction and unskilled work limitations accounted for Plaintiff's difficulties. However, the ALJ failed to explain how these limitations incorporate Plaintiff's moderate limitations with concentration, persistence, or pace. "[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision." *Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002). The ALJ has not adequately explained why he omitted from the mental RFC, and hypothetical to the VE, a limitation to reflect Plaintiff's deficiencies in concentration, persistence, or pace.

Accordingly, this case must be remanded so that the ALJ may properly incorporate Plaintiff's moderate limitations in concentration, persistence, or pace in determining Plaintiff's mental RFC.

### C. The ALJ's Credibility Finding

The ALJ discredited the Plaintiff's testimony regarding the severity of his depression because of the Plaintiff's failure to pursue treatment for his mental impairment, the invalid MMPI-2 results, and reports that he was able to get along with and visit his family and friends. Plaintiff contends that the ALJ committed reversible error because he never asked the Plaintiff his

explanations for failing to seek medical treatment, improperly discredited Plaintiff's testimony based on the MMPI-2 results, and improperly discredited his testimony because he could get along with his family members. The Court evaluates each argument in turn.

The Social Security Regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statement about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id.* The Regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a).

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;
(7)    Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In making a credibility determination, Social Security Ruling 96-7p ("SSR 96-7p") states that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statement about symptoms; any statements or other information provided

by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR 96-7p.

The Ruling further provides that the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see also Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). It is not sufficient for the ALJ to articulate a credibility finding with a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p.

An ALJ is not required to give full credit to every statement of pain or to find a disability every time a claimant states that he or she is unable to work. *See Rucker*, 92 F.3d at 496. However, SSR 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6; *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (explaining that an ALJ may not discredit a claimant's allegations of pain merely because those allegations exceed the objective medical evidence).

"[T]he adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p. As the Seventh Circuit has stated, "[B]ecause hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal quotations and citations omitted); *see also Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations

can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying"). Generally, an ALJ's credibility determination will not be overturned unless it was "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). However, when "credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Palmer v. Barnhart*, 40 F. App'x. 278, 283 (7th Cir. 2002). Finally, even if there is sufficient evidence in the record to support the ALJ's credibility determination, the ALJ must present "specific reasons" for his or her finding, and not simply recite the factors listed in the regulations. SSR 96-7p.

According to SSR 96-7p, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, *or other information in the record, that may explain infrequent or irregular medical visits or [Plaintiff's] failure to seek medical treatment*." SSR 96-7p (emphasis added). Plaintiff admits that the ALJ did "review and comment" on the Plaintiff's reasons for not seeking medical treatment, but contends that the ALJ was required to ask the Plaintiff to explain his reason for not pursuing medical treatment. However, this Court finds that the ALJ was not required to ask Plaintiff for an explanation. SSR 96-7p provides that "[t]he adjudicator *may* need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." SSR 96-7p (emphasis added). SSR 96-7p's language makes the need to recontact discretionary rather than mandatory. The ALJ here reviewed the information contained in the record explaining Plaintiff's

failure to pursue medical treatment, which included that Plaintiff saw the psychiatrist only once, stopped attending appointments and was discharged for lack of follow through on treatment recommendations, and stopped taking Lexapro because it did not work, but Plaintiff did not indicate trying any other medication. SSR 96-7p only requires the ALJ to consider Plaintiff's explanation or other information in the record, which the ALJ did here.

SSR 96-7p provides that the explanations given by the individual may provide insight into their credibility. SSR 96-7p then provides examples of good reasons for lack of pursuit of medical treatment, including minimizing symptoms, avoiding side effects, and inability to afford treatment. The record in this case, however, does not support, and Plaintiff does not even allege, that Plaintiff's failure to pursue medical treatment was due to any of the examples provided in SSR 96-7p.[12]

Accordingly, the ALJ complied with SSR 96-7p and his credibility determination, based on Plaintiff's failure to pursue medical treatment, was not "patently wrong."

With regard to the weight given the invalid MMPI-2 results, Plaintiff argues that invalidity alone is insufficient to discredit the Plaintiff's symptom testimony and the ALJ "played doctor" by discrediting Plaintiff's testimony based on the conclusion that the results were invalid without addressing the other explanation provided by Dr. Walsh. The Commissioner contends that given the paucity of medical evidence in the record, the ALJ did not commit legal error by discrediting the severity and intensity of Plaintiff's symptoms based upon the invalidity of the MMPI-2 results taken together with the other evidence contained in the record in finding that the Plaintiff was not under

---

[12] Although other courts in this Circuit have found that the ALJ erred in failing to question the plaintiff as to his failure to pursue medical treatment, those cases are distinguishable as the objective evidence supported the plaintiff's inability to afford regular treatment. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2002) (record supported in ability to pay for regular treatment); *Kittleson v. Astrue*, No. 08-cv-501-bbc, 2009 WL 679604, at *7 (W.D. Wis. March 16, 2009).

a disability for his mental impairment.

The Seventh Circuit has long held that ALJs are not to make their own independent medical findings. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Herron v. Shalala*, 19 F.3d 329, 334 n.10 (7th Cir. 1994); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). Dr. Walsh administered the MMPI-2 profile test to Plaintiff on May 24, 2007. After completing the test and analyzing the results, Dr. Walsh reported the results invalid. In particular, Dr. Walsh provided that Plaintiff "responded in an extremely exaggerated fashion and endorsed a wide variety of rare symptoms and attitudes . . . [which] . . . may be a result of excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help or a confused state." R. at 398. While the ALJ noted that the MMPI-2 results were invalid, he did not note the possible explanation for the results, as provided by Dr. Walsh. However, in failing to account for the possible explanations, the ALJ did not "play doctor" as Plaintiff contends. While ALJs are not permitted to "play doctor" by making their own independent medical findings and substituting their judgment for that of medical professionals, such is not the situation here. *Rohan*, 98 F.3d at 970. Dr. Walsh, and not the ALJ, concluded that the MMPI-2 results were invalid. Further, Dr. Walsh, not the ALJ, concluded that Plaintiff responded in an exaggerated fashion and endorsed a wide variety of rare symptoms and attitudes. Based on the record, the ALJ merely restated Dr. Walsh's conclusions and did not substitute his own judgment for Dr. Walsh's. Accordingly, the record does not support that the ALJ "played doctor." Nonetheless, even if the Court were to conclude that the ALJ erred by failing to address Dr. Walsh's offered explanations for the results in discrediting Plaintiff's testimony, such error would be harmless as the Court has already determined that the ALJ was not "patently wrong" in discrediting Plaintiff's crediblity by considering the failure to pursue treatment.

*See Buchholtz v. Barnhart*, 98 F. App'x. 540, 545-46 (7th Cir. 2004) (upholding an adverse credibility finding where the ALJ improperly played doctor but other evidence supported his credibility determination).

Next, the Plaintiff argues that the ALJ failed to consider how Plaintiff's daily activities were performed. Furthermore, Plaintiff argues that the ALJ improperly considered the fact that he was able to get along with his friends and family in discrediting the Plaintiff's symptom testimony of his mental impairment. The Defendant contends that the ALJ was not obligated to find that Plaintiff's functional activities were limited to the rare occasions when he was allegedly bound to his bed, given the episodic nature of Plaintiff's symptoms.[13]

An ALJ's credibility determination will not be overturned unless it is clearly incorrect and against the weight of substantial evidence. *Zurawski*, 245 F.3d at 887. At the second hearing, Plaintiff testified that his depression was "almost life-long" and that he was always depressed to some degree. R. at 415. The ALJ found that Plaintiff's depression was not as severe as he had testified given, among other things, his ability to get along and visit with his friends and family, which indicates that Plaintiff's depression was not perpetual, but episodic in nature. Further, contrary to Plaintiff's arguments, a review of the record indicates that the ALJ indeed considered how Plaintiff's daily activities were performed as the ALJ noted that Plaintiff testified that his depression made him spend "most of the time in his bedroom sleeping or watching television and [he] did not feel like getting out of bed due to depression and pain." R. at 233. While Plaintiff did report to Dr. Walsh that he had episodic depression, occurring every seven to ten days, as previously noted, Dr. Walsh found that Plaintiff's symptoms were extremely exaggerated. Accordingly,

---

[13] Plaintiff told Dr. Walsh that he experienced extreme sadness every week to ten days which lasted for about a week. R. at 396.

Plaintiff has failed to show that the ALJ did not consider how his daily activities were performed.

Further, Plaintiff cites Listings 14.00 for the proposition that an individual with the ability to communicate with friends and relatives may still have marked difficulty in maintaining social functioning. Listings 14.00 describes impairments of the immune system, particularly that of H.I.V. Listings 14.00(A). According to Listings 14.00, if a claimant's impairments do not meet the requirements of 14.08A-M, the claimant may still qualify under 14.08N, which requires the claimant to demonstrate marked restrictions in one of three areas of functioning such as daily living activities, social functioning, and deficiencies in concentration, persistence, or pace. *Id.* at § 8. In assessing claimant's capacity of social functioning, the criteria for incapacity is that the claimant "cannot engage in social interaction on a sustained basis." *Id.* However, in making that determination, the mere fact that the claimant can communicate with close friends or relatives should not be the basis for finding the capacity for social functioning. *Id.*

Nonetheless, the Court finds that Listings 14.00 is inapplicable to the instant matter. Listings 14.00 singularly concerns claimants with immune system impairments. This Listing does not apply to Plaintiff. Rather, the Court finds that Listings 12.00, which concerns claimants with mental impairments, is applicable to the instant matter. Under Listings 12.00, when assessing a claimant's social functioning, an ALJ may consider a claimant's ability to "get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." Listings 12.00(c)(2). Accordingly, under the applicable Listings, the ALJ's credibility determination is supported by substantial evidence.

Therefore, the Court concludes that the ALJ's credibility determination is not "patently wrong," but rather supported by substantial evidence with enough detail to "trace its path of

reasoning." *See Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005); *Scott*, 297 F.3d at 595.

## D. Conflict Between VE's Testimony and the DOT

Initially, the Plaintiff appealed the ALJ's adoption of the VE's testimony regarding the types of jobs available to the Plaintiff given the ALJ's hypothetical on the grounds that the ALJ did not resolve the conflict between the VE's testimony and the DOT. Defendant argues that Plaintiff has failed to identify any conflict between the VE's testimony and the DOT. In Plaintiff's reply brief, Plaintiff concedes that no conflict exists. Accordingly, the ALJ did not fail to comply with SSR 00-4p as no conflict existed between the VE's testimony and the DOT.

## E. VE's Lack of Foundation

Plaintiff's final argument is that the ALJ's determination at Step Five is not supported by substantial evidence because the VE failed to provide a proper foundation for the number of jobs that he identified. In response, the Commissioner asserts that Plaintiff failed to conduct further inquiry of the VE by failing to ask for underlying materials that he relied on to arrive at his conclusion, failed to ask that the record be left open after the hearing, and failed to ask for specific cross-references of the jobs identified.

A plaintiff seeking DIB bears the burden of proof through the first four steps of the ALJ's sequential evaluation process. At Step Five the burden of proof shifts to the ALJ to justify its determination. *Briscoe*, 425 F.3d at 352. Step Five requires the ALJ to prove that the plaintiff's RFC provides him the opportunity to engage in "work that exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country." 20 C.F.R. § 404.1566(a).

The Seventh Circuit has held that "standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). "If the basis of the [VE's] conclusions is questioned at the hearing . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Id.* A VE is allowed to "give the bottom line," however, all of the data used in coming to the "bottom line" must be "available on demand" if the claimant challenges the foundation of the VE's conclusions. *Id.*

The Seventh Circuit has provided that Federal Rule of Evidence 702 "does not apply to disability adjudications," but an administrative decision upholding the reliability of expert testimony must still be supported by substantial evidence. *Donahue*, 279 F.3d at 446.

Here, Plaintiff's attorney objected, under Rule 702, to the VE's testimony regarding the methodology used to determine the number of jobs cited during the hearing, thereby triggering the ALJ's duty to assess the reliability of the VE's testimony. *See Donahue*, 279 F.3d at 446. The ALJ responded to the Plaintiff's objection in his decision by noting that the Federal Rules of Evidence do not apply to disability adjudications and that 5 U.S.C. § 556(d) governs the admissibility of any oral or documentary evidence. 5 U.S.C. § 556(d) (stating "[a]ny oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence"). Nonetheless, the case law in this Circuit is clear that once the basis of the VE's conclusions is questioned at the hearing, the ALJ's duty to make an inquiry into the reliability of those conclusions is triggered. *See McKinnie*, 369 F.3d at 911; *Holtz v. Astrue*, No. 07-C-0314-C, 2008 WL 4704187, at *1 (W.D. Wis. Apr. 14, 2008).

While the ALJ correctly concluded that the VE's testimony was not irrelevant or immaterial, in assessing the reliability of the VE's methodology in arriving at his conclusions, the ALJ primarily focused on the failure of Plaintiff's counsel. Particularly, the ALJ noted that Plaintiff essentially asked for the VE's work product, failed to provide some other process that is directed and approved by force of law or trade practice for exacting relevant job information, failed to provide an alternative expert opinion, and failed to ask to purchase the material relied on by the VE.[14] While the ALJ and the Defendant are correct in asserting that Plaintiff failed to conduct these inquiries, or at least request that the record be left open after the hearing, Plaintiff was not required to do so. Rather, as previously noted, it is the ALJ's duty to inquire into the reliability of the VE's conclusions. *See id.* The record in this matter appears to be devoid of any such inquiry as the ALJ failed to make any finding regarding the reliability of the VE's methodology used to arrive at his conclusions. Therefore, remand is required on this issue.

Accordingly, this matter must be remanded to the ALJ to conduct a new Step Five analysis inquiring into the reliability of the methodology used by the VE to arrive at his conclusions.

## CONCLUSION

The Court finds that the ALJ properly evaluated the medical opinions of Dr. Farbat Usman and Dr. Digal Katarki, determined the credibility of Plaintiff's symptom testimony regarding his mental impairments, and adequately resolved the conflict between the VE's testimony and the DOT. However, the ALJ failed to include in his RFC a limitation to reflect Plaintiff's deficiencies in

---

[14] Although Plaintiff correctly argues that he should not be required to purchase the materials relied on by the VE, this issue is irrelevant to the instant matter as Plaintiff did not make a request for the materials.

concentration, persistence or pace, and the ALJ's finding at Step 5 was not supported by substantial evidence.  Therefore, to this extent, the Court hereby **GRANTS** Plaintiff's Opening Brief [DE 22] and **REMANDS** this matter for further proceedings consistent with this opinion.

SO ORDERED this 22nd day of April, 2009.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record